UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT L. WILSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 11 C 7807 |
| v. | ) |
| | ) Magistrate Judge Sidney I. Schenkier |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

In this social security appeal, the plaintiff, Robert L. Wilson, seeks judicial review of a final decision by the Commissioner of the Social Security Administration ("SSA") denying his application for Supplemental Security Income ("SSI") pursuant to the Social Security Act (the "Act"), codified at 42 U.S.C. § 405(g). Mr. Wilson has moved to reverse the Commissioner's decision denying his claim for SSI or, in the alternative, to remand his case for further review (doc. # 22). The Commissioner filed a cross-motion for summary judgment to affirm the decision (doc. # 24). For the reasons set forth below, we grant plaintiff's motion, and remand for further proceedings.

I.

We begin with the procedural history of the case. Mr. Wilson filed his SSI application on November 18, 2007, alleging disability beginning November 1, 1991 (R. 42). His claim was denied initially on April 24, 2008, and upon reconsideration on August 13, 2008 (*Id.*). On September 15, 2008, Mr. Wilson filed a written request for hearing, and on July 13, 2010, Mr. Wilson appeared and testified at a hearing before an Administrative Law Judge ("ALJ") (*Id.*). On August 6, 2010, the ALJ

---

[1]On December 7, 2011, by consent of the parties and in accordance with 28 U.S.C. § 636(c), this matter was referred to this Court for all further proceedings, including the entry of final judgment (doc. # 10).

issued a written decision denying Mr. Wilson's claim for SSI (R. 52). The Appeals Council denied Mr. Wilson's request for review on September 28, 2011, rendering the ALJ's decision the final decision of the Commissioner (R. 57). 42 U.S.C. § 405(g); *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). Mr. Wilson filed a timely complaint with the federal district court on April 9, 2012 (doc. # 1).

## II.

We now summarize the administrative record. We set forth the general background and Mr. Wilson's subjective medical complaints in Part A, followed by the medical record in Part B. In Part C, we discuss the hearing testimony, and we address the ALJ's written opinion in Part D.

### A.

Mr. Wilson was born on September 24, 1971; he was 36 years old at the time of his SSI request (R. 5). Mr. Wilson has three children still living, ages thirteen, nine, and ten; his fourth child died at the age of sixteen, one year before the administrative hearing in this case (R. 6). Mr. Wilson lives with his mother and two of his children (R. 15). He went to school until about the eleventh grade, and the only past relevant work indicated in the record is his brief employment as a day laborer or cleaner (R. 9, 25-26). Mr. Wilson was incarcerated for three years for aggravated battery and attempted murder, and then for another three years for violating his parole (R. 9).[2]

Mr. Wilson has suffered from seizures since the age of thirteen (R. 308). He takes medication to control his seizures (R. 304). In his testimony before the ALJ in July 2010, Mr. Wilson stated that he has seizures twice monthly (R. 11). However, in February 2008, after

---

[2] The dates of his incarceration are not listed in the record.

2

interviewing Mr. Wilson for the Bureau of Disability Determination Services ("DDS"), psychiatrist Dr. Kenneth Levitan reported that Mr. Wilson has a seizure every one to two months (R. 308).

Mr. Wilson was first diagnosed with depression in 1983, at the age of 12 years old (R. 308). He takes Fluoxetine and Seroquel to manage his depression (R. 250). He has also been diagnosed with sociopathic personality disorder (R. 311) and panic disorder (R. 387). Mr. Wilson has attempted suicide twice: at the age of 18 years old he cut his wrists, and at the age of 24 or 25 years old, he shot himself in the stomach (R. 21, 295).

Mr. Wilson claims he has trouble concentrating on daily activities, completing tasks, understanding directions, and getting along with others (R. 240, 452). He also complains of insomnia and hearing voices telling him to hurt himself (R. 295). He feels hopeless, like a failure (R. 452). Mr. Wilson has been hospitalized on numerous occasions because of his seizures and mental health issues (R. 11).

Mr. Wilson's mother and cousin submitted letters to SSA describing his behavior as ranging from staying in bed all day to being very hyperactive, and telling them in all seriousness stories that clearly were fanciful: such as, that he married Janet Jackson, and that Bart Simpson is his son (R. 288-90).

**B.**

The detailed medical record in this case begins in December 2006, when Mr. Wilson visited a clinic for a medication refill, and presented with depression, mood disturbances, insomnia, polysubstance abuse, and seizure disorder (R. 297). In 2007, he visited the clinic for refills of medication such as Trazadone (depression), Fluoxetine (depression, panic attacks), Dilantin (seizures), and Seroquel (schizophrenia) (R. 305).

On February 20, 2008, psychiatrist Dr. Kenneth Levitan interviewed Mr. Wilson for the Bureau of Disability Determination Services ("DDS") (R. 308). Mr. Wilson acknowledged having hallucinations, hearing voices, and being depressed and possibly bipolar for years, and he stated that he saw psychiatrists as an outpatient for the past 25 years (*Id.*). Mr. Wilson said that he takes Prozac, Trazadone, and Phenytoin (for seizures) (*Id.*). Mr. Wilson denied substance and alcohol abuse, though Dr. Levitan found evidence of this in the medical records (R. 309).

Dr. Levitan noted that Mr. Wilson was vague and unclear, and gave an inconsistent and questionable history of his family life and substance abuse (R. 309-10). Dr. Levitan stated that Mr. Wilson does not like being around other people, and that he has underlying anxiety and difficulty with recent memories and concentration (R. 310). Dr. Levitan concluded that Mr. Wilson was not depressed at the time of the evaluation, and he diagnosed Mr. Wilson with sociopathic personality disorder and seizure disorder (R. 311). Dr. Levitan opined that Mr. Wilson could perform simple and routine tasks, but that he would have some difficulty handling regular work pressure and stress (*Id.*). Dr. Levitan also found that Mr. Wilson could communicate with coworkers and supervisors and follow and understand simple instructions, but he could not be relied on to retain the instructions (*Id.*).

On March 5, 2008, state agency medical consultant Dr. Towfig Arjmand completed a physical RFC assessment for Mr. Wilson. He found that Mr. Wilson should avoid concentrated exposure to hazards (R. 316) and avoid climbing ladders, ropes, and scaffolds because of his seizure disorder (R. 314), but that he had no other limiting physical conditions (R. 319). Dr. Arjmand found that Mr. Wilson was "only partially credible" because Mr. Wilson claimed to have at least one

seizure per month, while the last seizure indicated in the medical records was in December 2005 (R. 316-17, 319).

Next, a non-examining DDS consulting physician, Dr. Elizabeth Kuester, completed a psychiatric review technique on March 13, 2008, and evaluated Mr. Wilson for affective disorders, personality disorders, and substance addiction disorders (R. 320). Dr. Kuester found that Mr. Wilson's depression was stable with medication (R. 323). She further indicated on the form that Mr. Wilson has "pathological dependence, passivity, or aggressivity" (R. 327). Dr. Kuester attributed some of his behavioral changes to regular substance abuse, which affects the central nervous system (R. 328).

As to Mr. Wilson's functional limitations, Dr. Kuester found that Mr. Wilson has "mild" restrictions of activities of daily living ("ADLs"); "moderate" difficulties maintaining social functioning; "moderate" difficulties maintaining concentration, persistence, or pace; and no episodes of extended decompensation (R. 330). Dr. Kuester further found that Mr. Wilson is "moderately limited" in his ability: to understand and remember detailed instructions, to carry out detailed instructions, to complete a normal workday and work week without interruptions from psychologically based interruptions, to maintain attention and concentration for extended periods of time, to interact appropriately with the general public, to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently of others (R. 334-35). In all other categories, she found that Mr. Wilson has no significant limitations (*Id.*). In her final remarks, Dr. Kuester wrote that Mr. Wilson has chronic substance abuse, antisocial behavior, and depression, and that he was not a credible or reliable historian because he told inconsistent stories (R. 336). She found Mr. Wilson's cognitive functions to be "fair" based on current and past sources (*Id.*).

Ultimately, she opined that Mr. Wilson could perform simple, repetitive tasks adequately with normal supervision, but that he should not deal extensively with the public (*Id.*).

DDS consulting physicians Drs. George Andrews, M.D., and Ronald Havens, Ph.D., reviewed the opinions of Drs. Arjmand and Kuester, and affirmed their physical and mental RFC determinations (R. 344-45).

In November and December 2008, Dr. Robert Owens treated Mr. Wilson four times for depressive symptoms after the death of his son (R. 471-475). During their sessions together, Dr. Owens and Mr. Wilson discussed the emotional toll from the loss of Mr. Wilson's son (R. 471), emotional stress due to past failures (R. 472), and feelings of sadness because of his poor familial relationships and unemployment (R. 473).

Dr. Owens contacted Mr. Wilson in January and February 2009 to encourage him to continue treatment (R. 469-70). On March 17, 2009, Dr. Owens attempted to reach Mr. Wilson again, but instead spoke with Mr. Wilson's cousin, who stated that Mr. Wilson was very depressed and socially isolative during recent weeks (R. 468). Dr. Owens informed Mr. Wilson's cousin that if Mr. Wilson failed to comply with treatment his case would be closed (R. 468). On May 27, 2009, Dr. Owens discharged Mr. Wilson for failure to comply with treatment (R. 461). In addition to Dr. Owens's initial diagnoses of depression, hopelessness, and grief over his son's death, the discharge diagnosis listed bipolar disorder (R. 461).

In July 2009, Mr. Wilson presented to the hospital feeling jumpy and anxious and worried that a seizure was imminent (R. 370-71). In November 2009, Mr. Wilson returned to the hospital for a refill of his depression and seizure medications (R. 378).

Dr. Karla Torres, Psy.D., treated Mr. Wilson six times between December 7, 2009, and February 11, 2010, in individual and group therapy sessions (R. 387). On December 7, 2009, Mr. Wilson reported current passive suicidal ideation, little interest in doing things, trouble sleeping, poor appetite, feeling tired, and trouble concentrating (R. 450-52). Dr. Torres diagnosed Mr. Wilson with major depression and seizure disorder, and assessed his functional impairment as severe (R. 451).

On February 1, 2010, Dr. Torres diagnosed Mr. Wilson with panic disorder without agoraphobia, depression, and seizure disorder (R. 448). She indicated that his compliance with their action plan for his depression and panic disorder was good, but that the efficacy of the treatment plan was poor (R. 447).

On February 18, 2010, Dr. Torres completed a "Mental Impairment Questionnaire (RFC & Listings)" for Mr. Wilson. On the evaluation, Dr. Torres indicated that Mr. Wilson suffers from panic disorder without agoraphobia, depression, cognitive disorder, and seizure disorder, and she assessed his Global Assessment Functioning ("GAF") at 50 (R. 387). Dr. Torres further found that Mr. Wilson suffers from the following symptoms: poor memory, panic attacks, hallucinations, decreased energy, disorientation, oddities of thought, mood disturbance, persistent anxiety, anhedonia, paranoia, appetite disturbance, and psychomotor agitation or retardation (*Id.*). She also wrote that his depression and anxiety are in the severe range of functional impairment (R. 388). Dr. Torres gave Mr. Wilson a provisional diagnosis of cognitive impairment, possibly due to a head injury from an auto accident several years ago (*Id.*). She indicated that Mr. Wilson's impairment lasted or can be expected to last at least 12 months, and that his impairment or treatment would cause him to be absent from work about three times a month (*Id.*).

Dr. Torres further concluded that Mr. Wilson has "poor" or no ability to sustain an ordinary work routine without special supervision, to maintain focus for two hours, or to remember work-like procedures (R. 389). However, Mr. Wilson has a "fair" ability to carry out very short, simple instructions, to be punctual within customary, usually strict, tolerances, and to work in proximity to others without being unduly distracted (*Id.*). Additionally, Dr. Torres found that Mr. Wilson has a "fair" ability to work a normal workday or week without interruptions from psychologically-based disturbances, to ask simple questions or request assistance, to respond to changes in the work setting, and to deal with normal work stress (*Id.*). Dr. Torres also found that Mr. Wilson has "good" ability to make simple work-related decisions, to perform at a consistent pace without an unreasonable number of rest periods, to be instructed or take criticism from supervisors, to get along with co-workers, and to be aware of normal hazards (*Id.*).

Dr. Torres also assessed Mr. Wilson's paragraph B criteria. She found that he has slight restriction in activities of daily living ("ADLs") and no difficulties in maintaining social functioning. However, she indicated that Mr. Wilson "often" has deficiencies of concentration, persistence, or pace (as opposed to seldom, frequent, or constant), and he has three or more episodes of decompensation a month in work-like settings (R. 390).

On April 3, 2010, Mr. Wilson received a substance abuse treatment plan and Methadone referral (R. 436-37). His last use of Methadone was noted three days earlier and his last seizure was noted as March 2010 (R. 432). In May 2010, Mr. Wilson went to the hospital complaining of wrist pain, but also noted that he had been depressed and having suicidal thoughts and hearing voices for the last two weeks (R. 415-17).

During the second half of 2011, Mr. Wilson received psychiatric treatment and medication management training from the Circle Family Healthcare network to address his depression, hallucinations, and delusions, which cause him to isolate himself from others and make him angry (R. 456-57). His social worker noted he was willing to participate in treatment and wanted to better understand his illness (*Id.*).

### C.

On July 13, 2010, Mr. Wilson testified in front of the ALJ (R. 1). Mr. Wilson testified that he suffers from depression, seizures, and bipolar disorder (R. 8). He testified that he has two seizures a month and that he had been in the hospital two days prior to the hearing because he had a seizure (R. 11). He testified that he cannot work because of his seizures and because he does not want to be around people (R. 10). Mr. Wilson also testified that he has been hospitalized for mental health problems, most recently about two months before the hearing because he was upset over the death of his son (R. 11, 14).

Mr. Wilson testified that he does not cook his own meals or take care of his home (R. 17-19). He repeated that he was tired during the hearing (R. 14-15, 17-21). He said he does not like to be around people because everyone is against him (R. 22). He testified that he is compliant in taking his daily medications, but they are not effective in stopping him from hurting and being scared and tired (R. 23-24).

The vocational expert ("VE"), Glee Ann Kehr, testified next. The ALJ asked the VE to assume an individual in the younger age category with a limited education and limited, light and unskilled past relevant work:

> And assuming further that the individual is unable to work around moving or dangerous machinery and additionally has a moderate inability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, respond appropriately to changes in the work setting, set realistic goals and make plans independently of others and complete a normal work day and work week without interruption from psychologically based symptoms. And to perform at a consistent pace without an unreasonable number and length of rest periods, approximately ten percent of the time.

(R. 26-27).

The VE testified that this hypothetical person could not do Mr. Wilson's past work of cleaner or day laborer because the work involved too many steps (R. 27). The VE stated that the only type of work for such an individual is manufacturing jobs as long as the individual would be off task no more than ten percent of the time and miss no more than one day of work per month (R. 27-29). The VE stated that according to the DOT, the types of manufacturing jobs available in the Chicago metro area include: assembly (6,400 jobs), packaging (3,700 jobs), and sorting (3,800 jobs) (R. 27-28).

**D.**

In his written opinion on August 6, 2010, the ALJ found Mr. Wilson not disabled under the Act (R. 42). At Step One, the ALJ found that Mr. Wilson had not engaged in substantial gainful activity since November 19, 2007, the date he filed his application (R. 44). At Step Two, the ALJ determined that Mr. Wilson's seizures and depression were severe.

At Step Three, the ALJ found that Mr. Wilson does not have an impairment that meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*Id.*). The ALJ stated that the record showed that Mr. Wilson's monthly seizures were controlled with medication, and he does not have more than one a month, and therefore does not meet medical Listing 11.02 (convulsive epilepsy) or 11.03 (nonconvulsive epilepsy) (R. 44-45). The ALJ also

found that Mr. Wilson's mental impairment did not meet or medically equal Listing 12.04, for mental disorders (R. 45). In making that finding, the ALJ found that Mr. Wilson's mental impairments do not meet the paragraph B criteria because he has not shown two "marked" restrictions (*Id.*). Relying on the DDS state agency consultants, the ALJ found that Mr. Wilson had mild restrictions in ADLs; moderate difficulties in maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace; and no repeated periods of decompensation of extended duration (*Id.*). The ALJ also found that Mr. Wilson does not satisfy the paragraph C requirements (*Id.*).

The ALJ then determined Mr. Wilson's RFC (R. 46). The ALJ found that Mr. Wilson could perform the full range of work at all exertional levels but he cannot "work around dangerous or moving machinery" (*Id.*). The ALJ added that Mr. Wilson "has a moderate inability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to interact appropriately with the general public; to respond appropriately to changes in the work setting; to set realistic goals and make plans independently of others; and to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (10% of the time)" (*Id.*).

Next, the ALJ reviewed the medical evidence as to Mr. Wilson's claims of disability due to depression, seizures, and bipolar disorder (R. 46). The ALJ noted that Mr. Wilson took medication for his depression and seizures, and reported no side effects from the medication (*Id.*). Mr. Wilson also reported a "long history of depression," which included two suicide attempts, and hospital visits going back to December 2006 (R. 47).

The ALJ reviewed DDS consultative psychiatrist, Dr. Levitan's, evaluation of Mr. Wilson from February 20, 2008 (R. 47). The ALJ noted that Mr. Wilson reported to Dr. Levitan that he was paranoid and had hallucinations, and had undergone intermittent treatment for the past 25 years for depression, schizophrenia, and bipolar disorder (*Id.*). While Mr. Wilson had denied any history of drug use, he gave an "inconsistent and questionable history" to Dr. Levitan (*Id.*). Dr. Levitan reported that Mr. Wilson appeared to have below average intelligence, with difficulty concentrating and remembering recent events, and questionable insight, but Mr. Wilson's ability to think abstractly seemed concrete (*Id.*). The ALJ stated that Dr. Levitan described Mr. Wilson's affect as "distant, controlled and fairly even with some anxiety noted when stressed or upset" (*Id.*). Dr. Levitan diagnosed Mr. Wilson with sociopathic personality disorder, seizure disorder, and past drug and alcohol abuse, but no depression NOS (*Id.*). The ALJ wrote that it was Dr. Levitan's opinion that Mr. Wilson "could perform simple and routine tasks, would have some difficulty handling regular work pressure and stress, could communicate with coworkers and a supervisor and could follow and understand instructions but not be relied on to retain them" (*Id.*).

The ALJ then turned to DDS consultant, Dr. Arjmand's, physical RFC determination (R. 47). The ALJ stated that relative to Mr. Wilson's seizure disorder, Dr. Arjmand opined that Mr. Wilson could perform work at all exertional levels, with the exception that Mr. Wilson should avoid concentrated exposure to workplace hazards (R. 48).

Next, the ALJ turned to DDS consultant Dr. Kuester's psychiatric review from March 13, 2008 (R. 48). The ALJ noted that Dr. Kuester found that Mr. Wilson had mild restrictions in ADLs; moderate difficulties in maintaining social function; and moderate difficulties in maintaining concentration, persistence, and pace (*Id.*). Dr. Kuester assessed Mr. Wilson's mental RFC, and

found that he was moderately limited in his ability: to understand, remember, and carry out detailed instructions; to maintain concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to respond appropriately to changes in the work setting; and to set realistic goals and make plans independently of others (*Id.*). Dr. Kuester opined that Mr. Wilson could learn and perform simple, repetitive tasks adequately with ordinary supervision, but that he should not have to interact extensively or deal with the public (*Id.*).

After reviewing a few visits to hospitals apparently unrelated to Mr. Wilson's claims of disability, the ALJ turned to the opinions of Dr. Torres, Mr. Wilson's most recent treating physician (R. 48). The ALJ reviewed Mr. Wilson's December 7, 2009 appointment with Dr. Torres, during which Mr. Wilson reported current passive suicidal ideation and depression. The ALJ stated that Dr. Torres found Mr. Wilson had moderate impairment in ADLs and mild impairment in social functioning (*Id.*). Additionally, the ALJ noted that Mr. Wilson told Dr. Torres that he had achieved some relief from group counseling, and he was part of a church community (*Id.*). The ALJ noted that Mr. Wilson also reported to Dr. Torres that he had feelings of anhedonia, insomnia, fatigue, self-loathing, and trouble concentrating (*Id.*). The ALJ also noted Mr. Wilson's February 1, 2010 appointment with Dr. Torres, at which Mr. Wilson admitted to having increased anxiety from recent events (R. 49).

The ALJ also reviewed the Mental Impairment Questionnaire which Dr. Torres completed on February 18, 2010 (R. 49). In that questionnaire, Dr. Torres stated that Mr. Wilson was responding to treatment (for his panic disorder, depression, seizure disorder, and cognitive disorder),

but would miss work about three times a month due to his impairments or treatment (*Id.*). The ALJ also wrote that Dr. Torres opined that Mr. Wilson had "slight restriction of daily activities of living" and "no difficulties in maintaining social functioning," but "often had deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner," difficulties following instructions, deficits in memory, and a GAF of 50 (*Id.*).

The ALJ then noted that in April and May 2010, Mr. Wilson visited the hospital complaining of substance abuse issues, depression, suicidal thoughts and hearing voices (R. 49). Mr. Wilson testified that he takes his medications but continues to hear voices (*Id.*).

Ultimately, the ALJ found Mr. Wilson's impairments could "reasonably be expected to cause the alleged symptoms," but the ALJ did not find Mr. Wilson credible "to the extent [his symptoms] are inconsistent with" the RFC (R. 49). The ALJ reasoned that Mr. Wilson had not "received the type of medical treatment one would expect for a totally disabled individual," and there were gaps in Mr. Wilson's treatment records from February 28, 2008 to October 2008, and February 9, 2009 to July 2009 (*Id.*). The ALJ also found that Mr. Wilson's medications have been "relatively effective" in controlling his symptoms, especially with respect to his seizure disorder (*Id.*). The ALJ found that "certain aspects of the Dr. Torres' opinion are in fact consistent with the [RFC] determined in this decision," and otherwise noted that Dr. Torres's treating relationship with Mr. Wilson was "quite brief" (R. 50). Further, the ALJ gave "some weight" to the opinions of the DDS consultants, whose opinions the ALJ found supported a finding of "not disabled" (*Id.*). Thus, the ALJ did not find Mr. Wilson's testimony "regarding the severity or the frequency of his symptoms to be fully credible or supportive of any greater limitations or restrictions" than those set forth in the RFC (R. 49).

14

At Step Four the ALJ determined that Mr. Wilson was unable to perform his past work as a cleaner (R. 50). At Step Five, the ALJ found the evidence showed that Mr. Wilson's "documented mental limitations do not result in deficits that would preclude the performance of competitive remunerative work requiring the ability to respond appropriately to supervisors, co-workers and works situations, and deal with changes in a routine work setting" (R. 51). Therefore, the ALJ found that there are a substantial number of light and unskilled jobs available in the national economy for Mr. Wilson to perform: assembly (6,400 jobs), packaging (3,700 jobs), and sorting (3,800 jobs) in the Chicago metro area (*Id.*). Thus, the ALJ found Mr. Wilson not disabled under the Act (*Id.*).

### III.

We begin our review of the Commissioner's determination with the governing legal standards. To establish a disability under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

The social security regulations outline a five-step sequential evaluation process for determining whether a claimant has a disability. 20 C.F.R. § 404.1520(a)(4). These steps require the ALJ to determine: (1) whether the claimant is currently performing any "substantial gainful activity;" (2) whether the claimant's alleged impairment or combination of impairments is severe; (3) whether the claimant's impairment(s) meet(s) or equal(s) any impairment listed in the appendix to the regulations as severe enough to preclude substantial gainful activity; (4) whether the claimant is unable to perform his or her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4).

A finding of disability requires an affirmative answer at either Step Three or Step Five. 20 C.F.R. § 404.1520(a)(4). A negative finding at any step other than Step Three precludes a finding of disability. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). The burden of proof is on the claimant except for at Step Five, where the Commissioner must prove that significant numbers of jobs are available in the national economy for an employee with the claimant's RFC. 20 C.F.R. § 404.1520(g)(1).

On appeal, the Court may not decide facts anew, reweigh evidence, or substitute its own judgment for that of the ALJ. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). While judicial review of ALJ decisions "is deferential, it is not abject." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). We uphold an ALJ's decision if it is supported by substantial evidence; that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal citations and quotations omitted). Although the ALJ is not required to address every piece of evidence or testimony presented, the Court "cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker*, 597 F.3d at 921 (internal citations omitted).

## IV.

Mr. Wilson challenges several aspects of the ALJ's decision, but we focus on one in particular: the way in which the ALJ addressed the opinion of Mr. Wilson's treating physician, Dr. Torres (doc. # 23: Pl.'s Mem. at 7). The ALJ did not give Dr. Torres's opinion controlling weight. Further, the ALJ did not specify what weight he gave Dr. Torres's opinion, which of her opinions he disagreed with, or how he arrived at his conclusion. We agree this error warrants remand.

16

"[A]n ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) it is not inconsistent with substantial evidence in the record." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (internal quotations omitted). "If the opinion is unsupported or inconsistent with the record, the ALJ may still choose to accept it, but if the ALJ rejects the opinion, he must give a good reason." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). "Even if an ALJ gives good reasons for not giving controlling weight to a treating physician's opinion, she has to decide what weight to give that opinion," considering "the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and support for the physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)).

Here, Dr. Torres had opined that Mr. Wilson's impairment or treatment would cause him to be absent from work about three times a month (R. 388). She further indicated that Mr. Wilson "often" has deficiencies of concentration, persistence, or pace, and he has three or more episodes of decompensation a month in work-like settings (R. 390). Dr. Torres concluded that Mr. Wilson has "poor" or no ability to sustain an ordinary work routine without special supervision, to maintain focus for two hours, or to remember work like procedures (R. 389). By contrast, the ALJ found that Mr. Wilson had the RFC to perform a full range of work at all exertional levels, with the only limitation being that he is unable to work around dangerous or moving machinery (R. 46). The ALJ specified that Mr. Wilson could complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without need for rest periods more than 10 percent of the time (*Id.*).

Though the ALJ recounted Dr. Torres's opinions in some detail, the ALJ's explanation of why he declined to give those opinions controlling weight was terse: "[w]hile Dr. Torres does have a treating relationship with the claimant, the treatment history is quite brief. Further, certain aspects of the Dr. Torres' opinion are in fact consistent with the [RFC] determined in this decision . . ." (R. 50). The ALJ's treatment of Dr. Torres's opinion was inadequate. While the ALJ does not have to give the treating physician's opinion controlling weight, the ALJ "must give good reason" for not doing so. *Shaaf*, 602 F.3d at 875. The ALJ failed to do so here.

*First*, the brevity of the treating relationship is not itself a sufficient basis to deny controlling weight to a treater's opinion. As explained above, before deciding what weight to give the treating physician's opinion, the ALJ must also consider the nature and extent of the treatment relationship, the physician's specialty, the types of tests performed, and the consistency and support for the physician's opinion. *Campbell*, 627 F.3d at 308 (citing 20 C.F.R. § 404.1527(d)(2)). The Seventh Circuit has described these considerations as a "required checklist of factors." *Id.* (quoting *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010)). Moreover, we note that Dr. Torres's six visits with Mr. Wilson over a three-month period reflect far more exposure to him than any of the consultative examiners had.

*Second*, the fact that Dr. Torres offered some opinions that coincided with the ALJ's determination is only part of the story. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Dr. Torres offered opinions that differed from the ALJ's opinion in critical ways, such as with regard to Mr. Wilson's ability to retain work procedures, maintain focus, and work without excessive

absences. To be sure, there was medical evidence in the record that was contrary to these opinions, but the ALJ offered no explanation as to why he found those contrary opinions more persuasive than those offered by Dr. Torres.

The ALJ also erred by not stating how much weight he gave to Dr. Torres's opinion. The ALJ stated a few pieces of Dr. Torres's opinion with which he agreed, and continued by stating that the non-examining physician's opinion deserved "some weight" (R. 50). The opinion says nothing about how much weight he ultimately gave the treating physician's opinion. Furthermore, the ALJ did not address the required factors to determine how much weight to give the treating physician's opinion. The length of treatment history is but one factor; the ALJ should have also considered Dr. Torres's specialty, the nature of her relationship with Mr. Wilson, and the consistency and support for Dr. Torres's opinion. *See* 20 C.F.R. § 404.1527(c) ("Unless we give a treating source's opinion controlling weight . . . , we consider all of the following factors in deciding the weight we give to any medical opinion.").

The ALJ's treatment of Dr. Torres's opinion was central to his determination of Mr. Wilson's RFC and the Step Five determination that jobs that Mr. Wilson could perform exist in substantial numbers. In remanding, we express no view as to what decision the ALJ should reach. We recognize that there is evidence in the record that is contrary to Dr. Torres's opinions; however, whatever result the ALJ reaches, it must be supported by a mode of analysis that complies with the governing case law and regulations.[3]

---

[3]Most of plaintiff's other challenges also go to the RFC and the Step Five analysis, and do not warrant discussion in light of our decision to remand. We note that the parties differ as to whether the ALJ was required to do more to determine the reason for what he found to be gaps in Mr. Wilson's treatment history (*compare* Pl.'s Mem. at 17-19 *and* Def.'s Mem. at 13-14). After the hearing, plaintiff submitted information to the Appeals Council that he says demonstrates that there were no gaps in treatment (Pl.'s Mem. at 18-19). On remand, the ALJ will have the opportunity to assess that information.

19

## CONCLUSION

For the reasons stated above, this Court directs the Clerk of the Court to enter judgment granting Mr. Wilson's motion for remand (doc. #22), and denying the Commissioner's motion to affirm the denial of benefits (doc. # 24). The case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: September 10, 2012